**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7                      UNITED STATES DISTRICT COURT

8                     NORTHERN DISTRICT OF CALIFORNIA

9
10
11
12   VALENTI AGGIO, et al.,

13             Plaintiffs,                    No. C 04-4357 PJH

14        v.                                  **ORDER GRANTING SEQUOIA**
                                              **INSURANCE COMPANY'S MOTION**
15   ESTATE OF JOSEPH AGGIO,                   **FOR SUMMARY JUDGMENT**

16             Defendant.
17   _____/

18        The motion of Sequoia Insurance Company ("Sequoia") for summary judgment

19   came on for hearing before this court on May 21, 2008.  Plaintiffs appeared by David J.

20   Lazerwitz and Dennis M. Cusack, and Sequoia appeared by John L. Kortum and Danielle

21   A. Arteaga.  Having read the parties' papers and carefully considered their arguments and

22   the relevant legal authority, and good cause appearing, the court hereby GRANTS the

23   motion.

24                              **BACKGROUND**

25        This is a cost recovery action brought under the Comprehensive Environmental

26   Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607, et seq., and

27   the California Hazardous Substances Act ("HSAA"), Cal. Health & Safety Code §§ 25300,

28   et seq., to recover response costs and other damages in connection with testing,

United States District Court

For the Northern District of California

1 assessment, and clean-up of contamination on and in the vicinity of real property located

2 on Stony Point Road in Cotati, California ("the Stony Point property" or "the property").

3    Plaintiffs are Valenti Aggio, Dorothy L. Aggio, and Livio Aggio.  Defendant is the

4 Estate of Joseph Aggio, deceased ("the Estate").  From 1947 until the time of his death in

5 1988, Joseph Aggio was the owner of the 156-acre Stony Point property.  In 1981, Joseph

6 Aggio purchased a Personal Catastrophe Liability policy from Sequoia, with a policy period

7 extending from October 1, 1981 to May 30, 1982.  He purchased a second policy for the

8 period May 30, 1982 through May 30, 1985.  The terms of the policies are identical, and

9 they are referred to collectively herein as the "Sequoia policy."

10    Probate opened for the Estate in 1988.  By the terms of his will, Joseph Aggio's

11 community interest in the Stony Point property was devised to his sons Valenti Aggio,

12 Sebastian ("Sam") Aggio, and Livio Aggio.  Probate, for which Sam Aggio was the

13 administrator, closed in 1989.  Also in 1989, Joseph Aggio's widow died, and the three

14 sons then inherited her half of the property.  At some point in the 1990s, the property was

15 sold to the Soiland Company, Inc.  In 2001, Sam Aggio died, and his widow Dorothy Aggio

16 acquired any interest he may have had in the property.

17    Between approximately 1958 and 1998, a 10-acre portion ("the Site") of the Stony

18 Point property was leased to the Cotati Rod & Gun Club ("CRGC"), at times pursuant to

19 written lease agreements.  CRGC paid an annual rent for the lease.  Prior to the time of his

20 death, Joseph Aggio also periodically leased portions of the property to his children for use

21 as a dairy farm, to Marvin Soiland ("Soiland") for use as a rock quarry, and to tenants living

22 in a house on the property.  He reported this rental income on his income tax returns.

23    During the lease period, CRGC operated three firing ranges and a trap shooting

24 range on the Site.  Plaintiffs assert that CRGC also allowed members of various state and

25 federal law enforcement agencies to come onto the Site to use the shooting range.  These

26 activities caused lead bullets and other contaminants to be deposited in the soil.

27    In December 1995, CRGC entered into a Voluntary Cleanup Agreement ("1995

28 VCA") with the State of California, Environmental Protection Agency, Department of Toxic

United States District Court
For the Northern District of California

1   Substances Control ("DTSC") for the purpose of investigating and remediating lead

2   contamination at the Site.  The 1995 VCA stated that the Site was previously owned by the

3   Aggio family, that CRGC had "had a series of 5 year leases," that the property had been

4   "sold to a new owner, Soiland Company, Inc.," and that "[t]he new owner requires that the

5   CRGC cleans up contamination from past activities . . . before the lease is renewed."  The

6   1995 VCA contained a provision allowing either CRGC or DTSC to "terminate this

7   Agreement for any reason" on 30 days' notice.

8       CRGC retained an environmental consultant to develop a removal action plan.  The

9   consultant produced a report, and CRGC began remediation efforts in September 1998.

10  After CRGC encountered financial difficulties and was unable to complete the work, DTSC

11  terminated the 1995 VCA in August 1999.

12      In February 2003, plaintiffs entered into a VCA with the DTSC ("2003 VCA").  The

13  2003 VCA indicated that the Site had formerly been owned by the Sebastian "Sam" Aggio

14  Family Trust UTA, and was currently owned by the Marvin K. Soiland Family Trust UTA.

15  As with the 1995 VCA, the purpose of the 2003 VCA was to enable investigation and

16  remediation of the soil contamination at the Site, and the 2003 VCA also contained an

17  identical provision allowing either side to terminate the agreement upon 30 days' notice.

18      Plaintiffs retained an environmental consultant to assist in the investigation of the

19  Site and preparation of a remediation plan.  The consultant prepared a removal action

20  report, which provided for remediation of the Site, but not for remediation of any off-Site

21  areas.  Plaintiffs claim that they cleaned up the CRGC Site in 2005, and spent over $1.1

22  million on the clean-up.

23      Plaintiffs filed the present action on October 14, 2004.  On November 23, 2004,

24  Sequoia filed an answer to the complaint, in its capacity as the liability insurer for the

25  Estate.  On June 1, 2005, plaintiffs filed the first amended complaint ("FAC"), alleging six

26  causes of action – (1) a claim for cost recovery under CERCLA § 107(a); (2) recovery

27  pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"),

28  California Health and Safety Code § 25363(e); (3) public nuisance; (4) equitable indemnity;

3

United States District Court

For the Northern District of California

1    (5) unjust enrichment; and (6) declaratory relief (seeking a judicial declaration that the

2    Estate is liable for all past and future costs pursuant to CERCLA, the HSAA, and "other

3    federal and state laws").

4         On October 3, 2005, Sequoia filed a third-party complaint against Soiland,

5    individually and as trustee for the Soiland Trust; the Stony Point Rock Quarry, Inc.; and

6    CRGC.  The third-party complaint alleges claims for contribution pursuant to CERCLA, for

7    contribution pursuant to HSAA, for equitable indemnity, and for declaratory relief.

8         On April 20, 2006, the DTSC issued a "Remedial Action Certification," which certified

9    that "all appropriate response actions have been completed, that all acceptable engineering

10   practices were implemented and that no further removal/remediation action is necessary."

11   DTSC indicated that the contamination had not affected groundwater or surface water at

12   the Site, and that the remedial action involved excavating and removing the top layer of

13   soil, the greatest depth of excavation being 15 inches.

14        Sequoia now seeks summary judgment on the first amended complaint.

15                              **DISCUSSION**

16   A.    Legal Standard

17        Summary judgment is appropriate when there is no genuine issue as to material

18   facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

19   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

20   Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

21   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

22        A party seeking summary judgment bears the initial burden of informing the court of

23   the basis for its motion, and of identifying those portions of the pleadings and discovery

24   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

25   v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

26   at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

27   than for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885,

28   888 (9th Cir. 2003).

United States District Court
For the Northern District of California

1  On an issue where the nonmoving party will bear the burden of proof at trial, the

2  moving party can prevail merely by pointing out to the district court that there is an absence

3  of evidence to support the nonmoving party's case.  <u>Celotex</u>, 477 U.S. at 324-25.  If the

4  moving party meets its initial burden, the opposing party must then set forth specific facts

5  showing that there is some genuine issue for trial in order to defeat the motion.  <u>See</u> Fed.

6  R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 250.

7  B.  Sequoia's Motion

8  Sequoia makes a number of arguments in support of its motion, asserting that it has

9  no duty under the policy to indemnify the Estate; that plaintiffs cannot establish liability

10  under CERCLA or the HSAA because the Site is not a "facility" under the statutory

11  definition; and that plaintiffs cannot sustain either a cause of action for continuing public

12  nuisance or a cause of action for unjust enrichment.

13  The court finds that summary judgment must be GRANTED on the ground that

14  Sequoia has no duty to indemnify the Estate, both because the Estate has not incurred

15  "damages" in a "suit," and because the policy's "owned property" and "business pursuit"

16  exclusions bar coverage.  In light of this determination, the court finds it unnecessary to

17  address Sequoia's remaining arguments.

18  1.  Whether the Estate has incurred "damages" in a "suit"

19  Sequoia asserts that under California Probate Code § 554, plaintiffs can prove

20  entitlement to indemnity only by demonstrating actual coverage under the Sequoia policy

21  for the relief they seek.  The policy's insuring agreement provides that Sequoia "agrees to

22  indemnify the insured for the ultimate net loss in excess of the retained limit which the

23  insured shall become legally obligated to pay as damages because of personal injury or

24  property damage."  The policy defines "ultimate net loss" as "[t]he total sum which the

25  insured, or any company as his insurer . . . become[s] obligated to pay in settlement or

26  satisfaction of losses for which the insured is liable either by adjudication or compromise

27  with the written consent of the company . . . ."

28  Sequoia argues that it is not obligated to indemnify the Estate for its share of the

5

United States District Court
For the Northern District of California

cost to remediate the soil contamination.  Sequoia argues that the provision in the policy requiring indemnification for the "ultimate net loss" that the insured "becomes legally obligated to pay as damages" should properly be interpreted as triggering Sequoia's indemnity obligation only if an ultimate net loss ripens into damages.  Sequoia contends that a judgment against the Estate on the FAC will not result in an indemnifiable judgment because it will be neither the product of a "suit" nor an award of "damages."

Sequoia contends that where, as here, the policy does not define "suit," it is judicially defined as a civil action commenced by a complaint.  Sequoia asserts that the underlying process that led to the remediation of the property, for which contribution is sought, does not satisfy this definition.  Because the VCA was a voluntary agreement to remediate pollution, and damages cannot flow from such an agreement, but only from money ordered by a court in the context of a "suit," Sequoia argues that plaintiffs cannot prove that the Estate will become legally obligated to pay damages – an essential element of plaintiffs' claim to the proceeds of the Sequoia policy.

Plaintiffs contend, however, that the <u>present action</u> is a "suit," in which "damages" will be awarded; and argue that Sequoia's duty to indemnify is therefore triggered. Plaintiffs claim that the 2003 VCA is relevant only as a cause of plaintiffs' damages.  They note that Joseph Aggio, the insured, did not enter into the VCA, and did not pay the costs of complying with the 2003 VCA or any other administrative order.  Plaintiffs assert that they complied with the VCA, and that the costs they incurred now serve as a measure of the damages that they seek from Joseph Aggio in this suit.  Thus, they contend, there is a "suit" that will result in court-ordered money damages.  They contend that a finding that Joseph Aggio is responsible for the contamination on and from the CRGC Site will result in "damages" for which Joseph Aggio, and Sequoia in turn under California Probate Code § 550, are liable.

The court finds that Sequoia has no duty to indemnify the Estate under the facts presented here.  As an initial matter, the court notes that an action to establish a decedent's liability for which the decedent was protected by insurance "may be

United States District Court

For the Northern District of California

1   commenced against the decedent's estate without the need to join as a party the

2   decedent's personal representative . . . ."  Cal. Probate Code § 550(a).  As a general rule,

3   however, damages sought against an estate are limited to insurance coverage unless the

4   estate's personal representative is joined as a party.  Cal. Probate Code § 554 (judgment in

5   favor of plaintiff "is enforceable only from the insurance coverage and not against property

6   in the estate").

7   Because plaintiffs can recover only if there is coverage for the claimed relief under

8   the Sequoia policy, plaintiffs can prove entitlement to indemnity only by demonstrating

9   actual coverage under the policy for the relief they seek.  However, the present action

10  seeking contribution to voluntarily-incurred environmental response costs is not a "suit"

11  seeking "damages."

12  Each of plaintiffs' causes of action against the Estate arises from the environmental

13  contamination of the Site, and the primary relief plaintiffs seek is the recovery of the costs

14  they incurred in remediating environmental contamination, pursuant to CERCLA

15  § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), and contribution under the HSAA, Cal. Health &

16  Safety Code § 25363(e).  See FAC ¶¶  22, 29.  The purpose of a § 107(a) action is to seek

17  cost recovery (as distinct from contribution) by a private party that has itself incurred

18  cleanup costs.  United States v. Atlantic Research Corp., 127 S.Ct. 2331, 2338 (2007).[1]

19  Under the HSAA, "[a]ny person who has incurred removal or remedial action costs in

20  accordance with [CERCLA § 107] may seek contribution or indemnity from any person who

21  is liable . . . "  Cal. Health & Saf. Code § 25363(e).

22  This court must begin its coverage analysis by examining the way in which the

23  damages were incurred, not the way the damages are being claimed.  See Vanderberg v.

24  Superior Court, 21 Cal. 4th 815, 838 (1999) (determinations of coverage must be made

25  individually by considering the nature of the property, the injury, and the risk that caused

26  the injury, in light of the provisions of the insurance policy).

27  ────────────────────

28  [1]  The court declined to decide whether § 107(a) also contains an implied right to
    contribution.  Id. at 2339 n.8.

1    Here, the loss that plaintiffs assert is the cost of soil remediation incurred pursuant to

2  the 2003 VCA.  The risk that caused that loss was CRGC's use of the Site as a shooting

3  range, and, secondarily, Joseph Aggio's lease of the Site to CRGC.  While the resulting soil

4  contamination is "property damage" as that term is defined in the Sequoia policy, a

5  judgment against the Estate compelling cost recovery or contribution to the cost of

6  remediating that property damage will not result in "damages" awarded in a "suit" as

7  required to trigger the duty to indemnify.

8    It is undisputed that the actions plaintiffs took under the 2003 VCA were voluntary,

9  as the VCA contained an unconditional termination clause that permitted either side to

10  terminate the agreement for any reason and at any time.  In Foster-Gardner, Inc. v. Nat'l

11  Union Fire Ins. Co., 18 Cal. 4th 857 (1998), the California Supreme Court held that the duty

12  to defend does not extend to proceedings conducted before the DTSC, notwithstanding

13  that such proceedings could ripen into a suit.  Id. at 878-79.

14    Moreover, if Joseph Aggio had entered into the VCA with DTSC, and had then

15  tendered the VCA to Sequoia for defense and indemnity, Sequoia would have had no

16  obligation to indemnify Joseph Aggio, because the VCA was not a "suit" (a civil action

17  commenced by a complaint).  And because the VCA was not a "suit," the voluntarily-

18  assumed costs of remediation incurred under the VCA cannot be "damages," because

19  "damages" are used in an insurance policy to mean "money ordered by a court" – that is, "a

20  money judgment entered against the insured in a third party suit for damages."  Certain

21  Underwriters at Lloyd's of London v. Superior Court, 24 Cal. 4th 945, 960, 964 (2001)

22  (Powerine I); see also CDM Investors & Travelers Cas. & Sur. Co., 139 Cal. App. 4th 1251,

23  1259 (2006).

24    The duty to indemnify entails the payment of money, and can arise only after liability

25  is established and damages are fixed in their amount.  Powerine I, 24 Cal. 4th at 958.  An

26  action seeking recovery from Joseph Aggio of the voluntarily-assumed response costs

27  incurred by plaintiffs does not transform those costs into "money ordered by a court."  Thus,

28  Sequoia has no duty under the policy to indemnify the Estate, and the fact that plaintiffs

United States District Court

For the Northern District of California

1    have now filed the present "suit" is beside the point.

2          2.          Whether plaintiffs' action is barred by operation of policy exclusions

3          Sequoia contends that even if the court were to find that plaintiffs' claims resulted in

4    an award of "damages," coverage for those damages would be precluded under the

5    policy's "owned property" and "business pursuit" exclusions.

6          Sequoia's first argument is that any "damages" that might be awarded to plaintiffs

7    are not covered under the Sequoia policy because the property damage from which the

8    claims arise was property owned by Joseph Aggio.  The policy provides that "[t]his policy

9    shall not apply . . . (c) to damage to (1) property owned by the insured."  Sequoia asserts

10   that this exclusion precludes plaintiffs' recovery in this case.

11         The "owned property" exclusion precludes coverage for costs incurred to clean up

12   one's own property, even if such measures prevent future damage to the property of

13   others.  Titan Corp. v. Aetna Cas. & Surety Co., 22 Cal. App. 4th 457, 472-73 (1994).  The

14   "owned property" exclusion does not apply to damage to groundwater.  See Intel Corp. v.

15   Hartford Acc. & Indem. Co., 952 F.2d 1551, 1565-66 (9th Cir. 1991).

16         Here, the remediation costs for which plaintiffs seek indemnity are limited to the

17   costs of remediating the soil contamination on the Site.  Sequoia notes that the DTSC

18   Remedial Action Certification makes it clear that the groundwater on the property was not

19   contaminated by the presence of lead bullets – just the soil.  Sequoia asserts that the fact

20   that plaintiffs were able to enter into a voluntary VCA with the DTSC to clean up the

21   contamination is indicative of the fact that the contamination was not an imminent threat to

22   the surrounding environment.  In addition, Sequoia asserts, these facts, combined with the

23   fact that the remediation efforts were not undertaken pursuant to a court or administrative

24   order, are sufficient to warrant application of the "owned property" exclusion.

25         Plaintiffs assert, however, that the "owned property" exclusion does not apply in the

26   present case because they plaintiffs seek costs calculated to mitigate injury to human life

27   and safety, as well as to third-party property.  They claim that the clean-up measures were

28   necessary to prevent contamination of third-party property through surface water and

United States District Court

For the Northern District of California

1    sediment contamination, airborne dust, and groundwater contamination; and that the

2    cleanup measures were also necessary to prevent human exposure to toxic lead. They

3    contend that under California law, this exclusion does not apply to mitigation of damage to

4    people, or to either mitigation of damage to third-party property, or to threat of future

5    damage to third-party property, and that here, there are at a minimum triable issues of fact

6    with regard to these questions.

7         Sequoia's second argument is that it is not obligated to indemnify plaintiffs because

8    Joseph Aggio's lease of the Site to CRGC was a "business pursuit."  The Sequoia policy

9    precludes coverage of damages arising from "any business pursuits (other than farming) or

10   business property (other than farms) of the insured."  The policy defines "business" as

11   "trade, profession, or occupation."  Sequoia contends that the lease of the Site to CRGC

12   constituted a "business pursuit" because CRGC paid an annual rent, and the fact that

13   Joseph Aggio was motivated by a desire for profit is evidenced by the fact that he reported

14   the income on his tax returns, and that he charged a late fee when the rent was late.

15        Plaintiffs contend, however, that Joseph Aggio was simply doing a favor for CRGC,

16   and not running a business.  Plaintiffs assert that he allowed the gun club on his property

17   as a favor to his friends and as a community service.  They contend that he was not

18   motivated by profit, asserting that he received no rent from CRGC for the first ten years that

19   CRGC used the property, and that he resisted raising the rent for CRGC, even though he

20   was receiving less than market value and CRGC had indicated it could pay more in rent.

21        Plaintiffs deny that Joseph Aggio treated the income he received from CRGC as

22   "business income," claiming that he did not depreciate the structures on this portion of the

23   property on his federal or state income tax returns.  Plaintiffs assert that the acceptance of

24   nominal rent does not turn a "favor" into a "business."  They claim that Joseph Aggio did

25   none of the things a landlord would normally do, such as maintenance, and never

26   negotiated a lease with CRGC.  In addition, they claim that the treasurer of CRGC does not

27   recall ever paying a late fee.

28        The court finds that plaintiffs have not created a genuine issue of material fact with

United States District Court

For the Northern District of California

1    regard to the application of either the "owned property" exclusion or the "business pursuits"

2    exclusion.  In determining whether a duty to indemnify exists, proof of actual or

3    substantially-threatened – not merely potential – third-party property damage caused by

4    owned property damage is necessary to defeat the "owned property" exclusion.  See Titan,

5    22 Cal App. 4th at 471-72.

6           Here, the Preliminary Endangerment Assessment prepared by the DTSC in May

7    1996, and the work plan prepared by the CRGC's environmental consultant in September

8    1998, found no contamination of groundwater and no environmental risk from airborne

9    release of pollutants.  In April 2006, the DTSC certified that "no further removal/remediation

10   action is necessary."

11          Plaintiffs claim, based on a declaration submitted by Gregory Murphy, the project

12   manager hired by plaintiffs in 2004 in connection with the investigation and remediation of

13   the hazardous waste at the Site, that the remediation of the Site was necessary to prevent

14   a risk posed to human health and the environment both within the area of the Site, and in

15   areas adjacent to and downstream or downhill from the Site.  However, plaintiffs have

16   presented no evidence showing any substantially-threatened damage at present, and no

17   evidence to counteract the DTSC's certification that no further action is necessary.

18          Nor have plaintiffs raised a genuine issue of material fact regarding the application of

19   the "business pursuits" exclusion.  The typical business pursuits exclusion turns on a profit

20   motive.  See Uhrich v. State Farm Fire & Cas. Co.,109 Cal. App. 4th 598, 618 (2003); see

21   also State Farm Fire & Cas. Co. v. Drasin, 152 Cal. App. 3d 864, 870 (1984) (defining

22   "business pursuit" as "regular activity engaged in for the purpose of earning a profit . . .

23   includ[ing] part-time or supplemental income projects").

24          Here, plaintiffs concede that Joseph Aggio leased the Site to CRGC over a period of

25   many years, beginning in the 1960s and continuing until his death in 1988, and received

26   income that he claimed on his income tax returns.  Indeed, the evidence shows that

27   between 1972 and 1988, Joseph Aggio's primary income came from rents, and that his

28   rental income included the rent from the CRGC Site, the ranch, the rock quarry, and a

1  house.  The failure to depreciate is irrelevant, as there is no evidence that there was in fact

2  anything to depreciate.

3  **CONCLUSION**

4       In accordance with the foregoing, the court finds that Sequoia's motion for summary

5  judgment must be GRANTED.

6       No later than July 3, 2008, the parties shall submit a joint written statement

7  specifying what claims remain in the case in light of the present decision on Sequoia's

8  motion for summary judgment.  The court is also willing to entertain a request by Sequoia

9  for partial judgment pursuant to Federal Rule of Civil Procedure 54.

10

11  **IT IS SO ORDERED.**

12  Dated:  June 19, 2008

13  _____
   PHYLLIS J. HAMILTON
   United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

12